**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | Case No. 2:12-cr-00237-APG-CWH |
| | ) | |
| vs. | ) | **FINDINGS AND** |
| | ) | **RECOMMENDATION** |
| JOSEPH ANDRADE, *et al*., | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the Court on Defendant Julian Gaytan's Motion to Suppress Illegally Seized Statements (#51), filed on October 26, 2012.  The Court also considered the Government's Response (#62), filed on November 8, 2012, and Defendant's Reply (#63), filed on November 10, 2012.  On January 18, 2013, the Court conducted an evidentiary hearing (#95).  Subsequently, supplemental briefing was submitted consisting of Defendant's Supplement (#97), filed on January 27, 2013, the Government's Response (#98), filed on February 1, 2013, and Defendant's Reply (#99), filed on February 3, 2013.

**BACKGROUND**

In the instant case, Defendants Julian Gaytan, Perla Ramirez, David Duran, and Joseph Andrade are charged with (1) Conspiracy to Travel in Interstate Commerce in Furtherance of a Racketeering Activity, in violation of 18 U.S.C. § 371, (2) Brandishing a Firearm in Furtherance of a Crime of Violence and Aiding and Abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2, (3) Interstate Travel in Aid of a Racketeering Activity and Aiding and Abetting, in violation of 18 U.S.C. §§ 1952(a)(2)(B) and (2), and (4) Brandishing a Firearm During a Crime of Violence and Aiding and Abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.  *See* Indictment (#1).

The Government alleges that on May 19, 2012, Perla Ramirez ("Ramirez") knocked on the door of the victim's residence and when the door opened, the three male defendants barged into the

1  home.  They proceeded to order everyone to the ground at gunpoint, threatened, assaulted and

2  battered some of the occupants, and stole property from the residence.  Ramirez and Joseph

3  Andrade ("Andrade") were arrested at the scene, but two males fled.  In the bed of Andrade's truck,

4  located outside the home, wallets containing the drivers licenses of both Julian Gaytan ("Gaytan")

5  and David Duran ("Duran") were discovered.  Neither Gaytan nor Duran were located at the scene.[1]

6        On June 30, 2012, Arizona Department of Public Safety Highway Patrol Officer Marcia

7  Johnson ("Johnson") was parked roadside on US Highway 60 near Surprise, Arizona conducting

8  her normal patrol duties.  At 2140 hours, she noticed a vehicle traveling toward her at a high rate of

9  speed on a portion of the road with a 45 mile per hour speed limit.  Johnson estimated the rate of

10  speed of the vehicle at 70 to 75 miles per hour and confirmed with radar that it was 72 miles per

11  hour.  She activated the emergency lights on her marked patrol vehicle and the subject vehicle

12  stopped without incident.  Johnson noticed that the vehicle had five occupants.  She approached the

13  vehicle from the passenger side for officer safety.  Johnson asked the driver of the vehicle, who she

14  later identified in court as Gaytan, for his drivers license, registration, and insurance.  Gaytan

15  provided his drivers license, but was unable to provide registration or insurance because the vehicle

16  was a rental car, which was later found out to be 15 days overdue.

17        Johnson returned to her vehicle with Gaytan's drivers license and contacted her dispatch

18  center to inquire whether there were any outstanding warrants.  She discovered that there was a

19  federal warrant for Gaytan's arrest in Nevada.  Johnson retrieved warrant information from the

20  computer on her vehicle, which indicated that Gaytan is considered armed and dangerous.  Back-up

21  police officers were requested and quickly arrived.  Johnson cuffed and searched Gaytan and placed

22  him in the rear of her patrol car without incident at 2205 hours.  In accordance with the information

23  contained in the arrest warrant, she contacted a Las Vegas FBI agent who confirmed Gaytan's

24  description and that the warrant was valid.  Johnson also issued a speeding ticket to Gaytan.

25        After Gaytan was taken into custody and placed in the patrol car, Johnson asked him

26  whether he knew of the warrant and what it was for.  Gaytan responded to the effect that the

27

28       [1] Duran has been indicted, but not apprehended.

2

1   warrant was based on his wallet being found in his friend's vehicle when they had gone to Las

2   Vegas.  *See* Def.'s Mot. #51-1.  Gaytan also provided other information about his background such

3   as, he was a former member of the "31 Street Doble" gang and had four months of probation left

4   from a robbery charge.  *Id.*  These are the "roadside statements" at issue in the instant motion.

5            Subsequently, Gaytan was detained at a local law enforcement facility in Buckeye, Arizona

6   until 0900 hours on July 3, 2012.  At that time, Officer Keland Boggs ("Boggs"), a Special

7   Investigator for the Arizona Department of Corrections, and FBI Special Agent Keith Thompson

8   ("Thompson") picked him up and transported him to a federal facility in Phoenix.  The trip took

9   about 15 minutes.  Boggs testified that, upon securing Gaytan in Thompson's official vehicle with a

10  seatbelt and handcuffs, he advised Gaytan of his Miranda rights.  Boggs indicated that he did so

11  because they intended to interrogate Gaytan regarding the Nevada case.  He testified that he read

12  Miranda rights to Gaytan using a Miranda card issued to him by an Arizona law enforcement

13  agency some years before.  Boggs did not bring the card itself to the evidentiary hearing before the

14  undersigned.  He testified that he did not recall the precise words he used to provide the Miranda

15  rights, but indicated that he has advised many suspects of the Miranda rights.  Boggs also testified

16  that, as is his usual practice, he believes that he advised Gaytan of the following: he had the right to

17  remain silent, that any statement he made could be used against him in a court of law, he had the

18  right to have an attorney prior to questioning, and if he could not afford an attorney and desired

19  one, one would be appointed for him.  Boggs asked Gaytan whether he understood these rights and

20  testified that, although he does not recall the specific words used, Gaytan indicated that he did

21  understand his rights and agreed to speak to him.

22           Thompson testified that he was in the vehicle when Miranda rights were read by Boggs to

23  Gaytan from a card.  He believed that the rights were the same as recounted by Boggs above, but

24  indicated that Gaytan was told that he had the right to an attorney during questioning.  Thompson

25  testified that Gaytan indicated he understood his rights and agreed to waive them.  His recollection

26  of the general nature of the discussion was the same as that of Boggs.  Gaytan was asked whether

27  he was aware of the charges in the indictment and asked if he knew any of the other co-defendants.

28  *See* Govt.'s Resp. #62-3.  He admitted knowledge of everyone on the indictment with the exception

of Duran.  *Id.*  Gaytan denied being involved in the incident that resulted in the indictment.  He indicated that he had left his wallet in his friend's vehicle.  *Id.*  Gaytan also spoke about his family situation, his girlfriend, and his relationship with the "31 Street Doble" gang.  *Id.*  These are the "transportation statements" at issue in the instant motion.  The statements were not recorded and neither Thompson nor Boggs were aware of the roadside statements made to Johnson.

By way of this motion, Gaytan requests that the Court suppress two statements made by him including: (1) roadside statements made to Johnson after the traffic stop and (2) transportation statements made to Boggs and Thompson during transportation to a police station.  Gaytan alleges that the statements were obtained in violation of his Fifth Amendment rights, without *Miranda* warnings, and involuntarily.  In addition, Gaytan asserts that the statements were obtained in violation of Federal Rule of Criminal Procedure 5 because he was subjected to undue delay in being presented to a magistrate judge for his initial appearance.

In response, the Government contends that the routine questioning conducted by Johnson did not rise to the level of custodial interrogation, which would require *Miranda* warnings.  Additionally, the Government argues that there is no evidence of coercion that would suggest that Gaytan's statements were involuntary.  Further, the Government contends that the circumstances surrounding the roadside statements do not have any connection to the voluntariness of the transportation statements.  Finally, the Government alleges that Gaytan's Rule 5 objection regarding delay in his appearance before a magistrate judge is untimely.  It indicates that the information regarding Gaytan's delay was known to him prior to the evidentiary hearing so he should have raised this argument in his initial motion or reply.  Additionally, the Government claims that the delay was reasonable due to the holiday weekend, shortage of personnel, and consent of a magistrate judge.

## DISCUSSION

### A.   Roadside Statements

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated."  U.S. CONST. Amend. IV.  It is well settled that a vehicle stop by the police is a

4

1  seizure within the meaning of the Fourth Amendment, *United States v. Garcia*, 205 F.3d 1182,

2  1186 (9th Cir. 2000) (*citing Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), and is subject to the

3  constitutional requirement that it be reasonable.  *Prouse*, 440 U.S. at 653-54.  The decision to stop

4  a vehicle is reasonable when there is probable cause to believe that a traffic violation occurred.

5  *Whren v. United States*, 517 U.S. 806, 810 (1996).  In this case, Johnson testified credibly that

6  Gaytan's vehicle was stopped because it was speeding – traveling 72 in a 45 mile per hour zone.

7  Gaytan made no argument that the traffic stop by Johnson was not based on probable cause to

8  believe a traffic violation had occurred.  Accordingly, the Court finds that the initial traffic stop was

9  reasonable.

10       The obligation to administer *Miranda* warnings attaches once a person is subject to

11  "custodial interrogation."  *Miranda v. Arizona*, 384 U.S. 436, 445 (1966).  Custody turns on

12  whether there is a formal arrest or a restraint on freedom of movement of the degree associated

13  with a formal arrest.  *U.S. v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (*amended

14  by U.S. v. Rodriguez-Preciado*, 416 F.3d 939 (9th Cir. 2005)) (*citing United States v. Kim*, 292

15  F.3d 969, 973 (9th Cir. 2002)).  In addition to being in custody, the accused must also be subject to

16  interrogation.  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  Not every question asked in a

17  custodial setting constitutes interrogation.  *U.S. v. Chen*, 439 F.3d 1037, 1040 (9th Cir. 2006)

18  (citing *U.S. v. Booth*, 669 F.2d 1231, 1237 (9th Cir. 1982)).  Interrogation means questioning or "its

19  functional equivalent," including "words or actions on the part of the police (other than those

20  normally attendant to arrest and custody) that the police should know are reasonably likely to elicit

21  an incriminating response from the suspect."  *Innis*, 446 U.S. 291 at 301.  The Ninth Circuit has

22  used an objective test to determine whether questioning constitutes interrogation.  *See, e.g., United

23  States v. LaPierre*, 998 F.2d 1460, 1466-67 n.6 (9th Cir. 1993).

24       While conducting the traffic stop, Johnson learned that there was an outstanding arrest

25  warrant for Gaytan, he was charged with a serious crime in Nevada, and was to be considered

26  armed and dangerous.  Johnson formally placed Gaytan into custody pursuant to the outstanding

27  arrest warrant by handcuffing, searching, and placing him in the rear of her patrol car.  Johnson

28  testified that she placed Gaytan in custody in the car, as per her usual practice, for officer safety.  In

1    addition, Johnson informed Gaytan that he was under arrest pursuant to a valid arrest warrant.

2    Therefore, the Court finds that Gaytan was in custody.

3            Additionally, the Court finds that Gaytan was subject to interrogation rather than routine

4    questioning to confirm his identity.  Johnson had already confirmed Gaytan's identity along with

5    the validity of the warrant and had completed the arrest by placing Gaytan in her patrol vehicle.

6    Her subsequent questions about whether Gaytan knew of the warrant and what it was for, served no

7    purpose except to obtain information regarding Gaytan's participation in the charges alleged in the

8    indictment.  Although Johnson was not aware of the relevance of his comments, Gaytan's response,

9    which included his admission that he had been in Las Vegas and his wallet was in his friends' car,

10   are matters of critical importance in this case.  Under these circumstances, the Court finds that

11   Johnson's questions were reasonably likely to elicit an incriminating response from Gaytan.

12   Gaytan's statements were not spontaneous, but rather were responsive to Johnson's questions to

13   explain why there was a warrant for his arrest.  Johnson's subjective intent to obtain information

14   from Gaytan is relevant, but not determinative, because the focus of the determination of whether

15   an interrogation occurred is on the perception of the defendant. *United States v. Moreno-Flores*, 33

16   F.3d 1164, 1169 (9th Cir. 1994).  Therefore, the Government's contention that Johnson intended to

17   ask Gaytan questions to confirm his identity does not convince the Court that there was no

18   interrogation.  Because Johnson failed to advise Gaytan of his Miranda rights after he was in

19   custody and subject to interrogation, the Court will grant the Motion to Suppress with respect to the

20   roadside statements.[2]  Accordingly, the roadside statements may not be used against in the case-in-

21   chief against Gaytan.[3]

22   _____

23        [2] The Court will not provide a significant analysis of Gaytan's alternative theory to suppress the
24   roadside statements, namely their involuntariness.  It is unnecessary to thoroughly explore this
     alternative because the Court finds that his roadside statements should be suppressed for lack of
25   *Miranda* warnings.  Nevertheless, the Court will note that Johnson testified that Gaytan was talking a lot
     and there does not appear to be any evidence of physical or psychological coercion that would support
26   suppressing the roadside statements for involuntariness.

27        [3] Despite the fact that voluntary statements taken in violation of *Miranda* must be excluded from
28   the Government's case-in-chief, the presumption of coercion does not bar their use for impeachment

6

1    **B.**    **Transportation Statements**

2        Gaytan makes three arguments in favor of suppressing the statements made to Boggs and

3    Thompson during his transport into the custody of the federal marshals in Phoenix, Arizona.  First,

4    Gaytan argues that the *Miranda* warnings given to him were defective.  Second, Gaytan argues that

5    under *Missouri v. Seibert*, 542 U.S. 600 (2004), a confession may be excluded when the police

6    previously obtained an unwarned confession.  Third, Gaytan argues that he was not brought before

7    a magistrate judge without unnecessary delay in violation of Rule 5.

8        Although Boggs testified that he used a card to read the *Miranda* rights verbatim to Gaytan

9    and believed that it was a "standard" *Miranda* card, he did not bring the card to the evidentiary

10    hearing.  Moreover, Boggs was unable to recall precisely what he told Gaytan.  Instead, when

11    pressed at the hearing, Boggs testified that he believed his advice was the same as he had given

12    many times before; the defendant had the right to remain silent, that any statement that he made

13    could be used against him in a court of law, that he had the right to have an attorney prior to

14    questioning, and that if he could not afford an attorney and desired one, one would be appointed for

15    him.  He then asked Gaytan whether he understood his rights.  Boggs testified that he did not recall

16    the specific words used, but that Gaytan indicated that he did understand his rights and agreed to

17    speak with him.  Thompson testified that he was present when the *Miranda* warnings were read to

18    Gaytan by Boggs.  His recollection of the advice given was similar to that recounted by Boggs, but

19    Thompson indicated that Gaytan was told that he had the right to an attorney during questioning.

20    The Court has no other evidence before it regarding the *Miranda* rights provided to Gaytan.  Each

21    officer has a different recollection of the Miranda warnings given; Boggs' version advised of the

22    right to counsel prior to questioning, while Thompson's version advised of the right to counsel

23    during questioning.  Because Boggs administered the warnings, the Court adopts his version and

24    finds that Gaytan was notified that he had the right to counsel prior to questioning.

25        A misleading *Miranda* warning is inadequate.  *California v. Prysock*, 453 U.S. 355, 361

26    (1981).  The Ninth Circuit has held that to be found "inadequate, an ambiguous warning must not

27    _____

28    purposes on cross-examination.  *Harris v. New York*, 401 U.S. 222 (1971).

1   readily permit an inference of the appropriate warning." *Doody v. Schriro*, 548 F.3d 847, 863 (9th

2   Ninth Cir. 2008).  In *United States v. Bland*, 908 F.2d 471, 473-474 (9th Cir. 1990), the officer's

3   *Miranda* warning informed the defendant that he had a right to an attorney prior to questioning and

4   if he could not afford one, an attorney would be appointed for him.  The warning, however, failed

5   to mention that the defendant was entitled to have an attorney during questioning and the Ninth

6   Circuit found the warning to be inadequate.  Specifically, the Ninth Circuit stated:

7       Although no "talismanic incantation" of the warning is necessary to satisfy *Miranda*, . . .
        *Prysock*, 453 U.S. 355, . . . we have recognized the "critical importance of the right to
8       know that counsel may be present during questioning." *United States v. Noti*, 731 F.2d
        610, 614 (9th Cir. 1984).  In *Noti*, we took the view that "[t]here are substantial practical
9       reasons for requiring that defendants be advised of their right to counsel during as well as
        before questioning." *Id*. at 615.  We will not retreat from *Noti* here.  The warning given
10      to Bland was inadequate.

11  908 F.2d at 474.  The Ninth Circuit has consistently followed this reasoning.  *See, e.g, U.S. v. San*

12  *Juan-Cruz*, 314 F.3d 384, 388 (9th Cir. 2002) ("In order to be valid, a *Miranda* warning must

13  convey clearly to the arrested party that he or she possesses the right to have an attorney present

14  prior to and during questioning."); *cf. U.S. v. Milton*, 2010 WL 762184 (March 4, 2010) (finding

15  *Miranda* warnings adequate because defendant was told, without any express or implied temporal

16  limitation, that he had the right to speak to an attorney rather than suggesting that he had the right

17  to one prior to, but not during questioning).

18      Requiring the Government to advise individuals of their *Miranda* rights is more than a mere

19  procedural nicety or legal technicality.  *Miranda*, 384 U.S. at 476 ("The requirement of warnings

20  and waiver of rights is . . . fundamental with respect to the Fifth Amendment privilege and not

21  simply a preliminary ritual to existing methods of investigation.")  It is imperative that the *Miranda*

22  warning procedure be taken seriously.  This Court cannot presume that Gaytan was aware of his

23  right to an attorney during questioning given that Boggs did not provide the Court with a copy of

24  the *Miranda* card he used.  Additionally, there was no testimony from Boggs or Thompson that

25  they had an interactive discussion with Gaytan to clarify whether he understood his right to an

26  attorney both prior to and during questioning.  This ambiguity is fatal to the Government's

27  contention that his transportation statements were given after a proper *Miranda* warning.  Because

28  the *Miranda* warning was inadequate, the Court finds that the transportation statements made to

8

1  Bogg and Thompson should be suppressed.[4]  Therefore, the Court will grant Gaytan's Motion to

2  Suppress with respect to the transportation statements because the substance of Gaytan's

3  constitutional rights under *Miranda* were not clearly conveyed based on the evidence presented to

4  this Court.

5        Given that the Court finds that the transportation statements should be suppressed under

6  Gaytan's first argument, it will only briefly address his other two arguments.  Gaytan argues that

7  under *Missouri v. Seibert*, 542 U.S. 600 (2004), a confession may be excluded when the police

8  previously obtained an unwarned confession.  In *Seibert*, the Supreme Court outlined a series of

9  relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective

10 enough to accomplish their objective including: "the completeness and detail of the questions and

11 answers in the first round of interrogation, the overlapping content of the two statements, the timing

12 and setting of the first and second, the continuity of police personnel, and the degree to which the

13 interrogator's questions treated the second round as continuous with the first."  542 U.S. at 615.

14 Here, there is no evidence that Boggs and Thompson knew that Gaytan failed to receive *Miranda*

15 warnings when questioned by Johnson.  Further, there is no evidence that they knew of the

16 existence or content of Gaytan's roadside statements.  In fact, Thompson testified that he was not

17 given access to Johnson's report of Gaytan's roadside statements and had no communication with

18 the Las Vegas FBI Agent about this case.  Accordingly, the Court finds that Gaytan's prior non-

19 Mirandized roadside statements would not warrant suppression of his subsequent transportation

20 statements.

21       Finally, Gaytan argues for suppression because he was not brought before a magistrate

22 judge without unnecessary delay in violation of Rule 5.  *See McNabb v. U.S.*, 318 U.S. 332 (1943)

23 (finding a defendant's confession inadmissible due to delay in presentment before judge); *see also*

24 *Mallory v. U.S.*, 354 U.S. 449 (1957); *U.S. v. Valenzuela-Espinoza*, 697 F.3d 742 (9th Cir. 2012)

25 (*citing Corley v. U.S.*, 556 U.S. 303 (2009)).  The Court must consider whether the delay between

26

27       [4] *But see Harris v. New York*, 401 U.S. 222 (1971) (statements may be used for impeachment on

28 cross examination).

9

Gaytan's arrest on June 30, 2012 and his initial appearance on July 3, 2012 was unreasonable or unnecessary and if so, then decide whether the transportation statements should be suppressed. *See Corley*, 556 U.S. at 332.  Based on the limited information provided in the supplemental briefing, the Court finds that the delay was not unreasonable.  Thompson called the Magistrate Judge's chambers and received instruction to deliver Gaytan for his initial appearance on July 3, 2012. Therefore, the Court would not recommend suppressing the transportation statements based on the *Mallory-McNabb* Rule.

Based on the foregoing and good cause appearing therefore,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant Julian Gaytan's Motion to Suppress Illegally Seized Statements (#51) be **granted**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 3rd day of May, 2013.

**C.W. Hoffman, Jr.**
**United States Magistrate Judge**

10